Spear, J.
It is established, either by concession or by evidence undisputed, that Emma B. Chareh and the testator, John S. Chareh, were married in the year 1873, and that she continued to live with him as his wife until his decease, June 1, 1891; that during his lifetime he became a member of the two orders named in the pleadings, the Legion of Honor, a Massachusetts association doing business in this state, and the Ancient Order of United Workmen, a domestic association; that he was a charter member of the latter order,. and held the office of treasurer therein from its formation until within about a year of his decease; that a benefit certificate was issued to said Chareh by each of the orders, payable at his death to his wife Emma B. Chareh, one for $3,000,and the other for $2,000, the proceeds of which certificates form the subject of the present controversy; that these certificates evidenced the contracts with the orders for payment of insurance upon the death of John S. Chareh, and that, according to the rules and regulations of the orders, no change could be made as to the person of the beneficiary except by a surrender of the certificate and the issuance of another in its place to another beneficiary, and that no such change was ever made during the life of *571 John S. Charch, but the beneficiary named in the original certificates remained the same; that the testator became a member of other associations and companies, and procured from them other certificates and policies upon his life; all which were in force at the time of his decease, amounting in the aggregate to the sum of $16,500; that on June 7, 1890, John S. Charch made bis last will in which he made provision for Emma B. Charch, in lieu of dower and all statutory provisions and allowances,” as stated in her answer, giving also to his four daughters, Kate D. Brendel, Nettie Bonner, Anna M. Charch and Minnie Charch, each five thousand dollars, to his son, John P. Charch, a business property in Dayton, in fee, and certain rents and income from other property, and providing farther, that at the death of the wife, or before with her consent, the executor should sell all the residue, real and personal, and divide the proceeds equally among his four daughters. The son was made executor without bond. May 21, 1801, he executed a codicil thereto the provisions of which are as follows:
“First — I hereby revoke and declare to be null and void, so much of item 1, of my last will and testament, as relates to my daughters, Anna Charch and Minnie Charch.
“Second — I hereby, give, devise and bequeath to mydaughters, Anna Charch and Minnie Charch, the land recently purchased by me and situated on the north side of the Eaton pike, west of the city of Dayton, and containing 12.98 acres in fee simple, and free of all incumbrance to each the undivided one-half.
“ Third — I direct that my executor collect and realize on my life insurance policies, which I hold *572 upon my life, and distribute the proceeds in accordance with the terms of my will and codicil, and I further direct said executor to pay off any and all incumbrance which may be a lien on the real estate on the Eaton pike, west of Dayton, out of the proceeds so by him realized.
“Fourth — I further give and bequeath, to my widow, Emma B. Chareh, one thousand dollars, which shall be in addition to the other provisions contained in my will, and to be paid by my executor.
u Fifth — Y give, devise and bequeath to my daughter, Nettie Bonner, the lots on the corner of Jay and Wyoming- streets, in the city of Dayton, to her heirs and assigns forever.”
June 1, 1891, John S. Chareh, deceased. June 8, following, the, will and codicil were probated, and, on the same day, the widow appeared in the pro-, bate court and elected “ to take and accept of the provisions made for me in said last will and testament and codicil, in lieu of my dower interest and distributive share of the personal estate.” The allegations of the answer that the estate was of the value of at least $80,000, and the provisions for the widow under the will and codicil were less than that to which she would have been entitled under the law, are not denied.
Evidence was introduced by parties opposed to Mrs. Chareh of the tenor following: At the time the codicil was executed the testator was dangerously ill with heart disease, and the wife and all the members of the family regarded his condition as critical. There were present at the time, Mrs. Chareh, John P. Chareh, the son, and one Carl Baumann, the latter of whom drew the codicil. The matter was talked over by father and son be *573 fore Baumann was called in, and at the request of the father, the son produced from a desk in the room a box containing the will and- other papers. At the request of the father, the son read to him the will. The father explained that he wanted to change the first item as to Anna and Minnie, and give them land instead. The mortgage on the land, about $4,000, he wanted paid, so that they would receive it clear. Among the papers were certain insurance policies and certificates on the life of the father. At his request the son figured them up and told his father they amounted to $16,500. He asked his father,then, “wherethis money was to come from, and he said it was to come off these insurance policies.” It was mentioned that the executor was'to collect the insurance money, and the iand was to be given to the girls, free of all incumbrance. The father asked the son to draw a codicil, but he declined, wanting his father to wait until morning and call in Judge Elliott; or some other lawyer, but the father, expressing a fea,r that he might not live until morning, refused to delay, and said Baumann could draw it. Mrs. Charch kept quiet and said nothing until it was arranged that Baumann (who was in another room) should be called in to write the codicil, and then she said she wanted one thousand dollars in lieu of the land her husband had bought with her money, which he consented to give her.' After Baumann came in she said something about his giving the girls more than he had, or “you haven’t got money enough to pay all this, ” to which he replied that he thought he had, and explained that he intended Anna and Minnie to have the land instead of the five thousand dollars each. In one part of his testimony the son puts it this way: He *574 stated how he wanted this insurance money distributed, and she asked him: “Papa, what do I get?” or something to that effect. “Why, ” he said, “I provided for you.” She said: “I would like to have a thousand dollars that you had to buy this land,” and he says: “Is there enough left?” I says, “Yes, there will be enough left.” The outline of what was wanted was given to Baumann, and he wrote the codicil, which was then read aloud and duly executed. It is difficult to determine exactly what Mrs. Charch did say, as the two witnesses are somewhat at variance, and the principal one, who undertakes to give it several times, fails to state it twice alike.
The foregoing- is a brief epitome of the testimony as to what took place at the time of the drawing of the codicil. Necessarily many statements and incidents are omitted here, but the above, it is believed, contains all that makes against Mrs. Charch. She did not participate in the making of the codicil, by either act or word, save in the making of the bequest as to the thousand dollars, and the suggestion of doubt of there being money enough to pay, whatever that may have been. It was clearly shown by the testimony of the son, that the thousand dollars referred to was money which Mrs. Charch had received from her father’s estate and had loaned to her husband who used it in the purchase of land which he had conveyed to a son-in-law. It does not appear that Mrs. Charch saw any of the insurance papers, or was apprised of their contents. Nothing at all was said about any of the insurance certificates or policies being those which had been made to her, nor was she asked to give up any interest of that kind, nor did she, by word or act, directly attempt to do so, and *575 the claim that she then understood that the policies to be used by the executor in paying legacies, etc., provided by the will and codicil included any which were payable to her, rests entirely on inference. She was present. She may have heard all that was said, and she may not. She did nothing, and said nothing by way of assent or dissent with respect to the use of the insurance money. She may have understood that her certificates were to be included, and she may not.
Of course if a contract is to be found it must rest upon what occurred at the time the codicil was drawn. Statements and acts afterward might throw light on what then took place, hut that which makes for as well as that which makes against Mrs. Charch, should be considered. Conversations about the time of the probating of the will are testified to which, if believed, tend to show that Mrs. Charch then consented that the proceeds of her certificates might go into the estate, and give color to the claim that she had so understood the matter all along, and certain acts shortly after that are consistent with that conclusion, but, on the other hand, other acts and claims made by her about the same time, or shortly after, are wholly at variance with it. Taken together, they evidence a woman somewhat broken, and one who did not well know her own mind. But our conclusion upon the controlling facts of the case renders it unnecessary to dwell upon this feature of it.
The evidence was introduced for two purposes : (1) To establish the alleged contract of Mrs. Charch with her husband to give up her insurance certificates, or the proceeds, and (2) to maintain the claim that it was the intent of the testator to include the certificates which belonged to her *576 among those which the executor was to collect and distribute in accordance with the will and codicil, and that she, at the time of the execution of the codicil, understood that intent and assented to it, and that her election afterward to take under the will and codicil instead of under the law, and the receipt by her of the benefits thus granted to her preclude her from now claiming the benefit of the insurance certificates. If competent for either purpose the evidence was properly received.
First, as to the contract. To sustain it two elements are necessary: a meeting of the minds, and valid consideration. It will be noted that. the evidence shows no discussion upon the night in question respecting the will so far as Mrs. Charch was concerned, and no suggestion that the provisions therein made for her benefit were to be disturbed. It will be farther noted that the only benefit she was to derive from the codicil was the legacy of one thousand dollars. The proposition; then, is, that she, knowingly and intentionally, agreed to surrender the sum of five thousand dollars already secured to her by the certificates and take in return the one thousand dollars provided by the codicil, a thing so inherently improbable that very strong and direct proof of the promise would be needed to justify a holding that she knowingly assented to the proposition. The alleged promise on her part should be clearly shown. It may, however, be said that the evidence tends to show that she assented to such an arrangement, and, while we think that in a case like this one the fact of the promise should be clearly established, or the contention ought to fail, still, as this presents aquestion of preponderance of evidence, this court would not be disposed to disturb the holding of *577 the court below upon such a difference of opinion. Waiving this, there remains the matter of consideration for the promise. What was it in this case? We scan the record in vain to find one that is'substantial, or that will stand in law. The benefit to be derived for this surrender, if any there were, was the thousand dollar legacy. But that was simply a provision for the payment by the husband of a debt he owed her, one which, had he made no provision for paying", she could have collected against his estate, and that without in the least affecting any other benefit which accrued to her by the will. He was, then, paying an undisputed debt, not making a gift, nor giving a legacy in lieu of any other benefit. The consideration for the legacy was the obligation arising from the loan of the money by the wife'; she was in this way simply getting back her own. Under such circumstances the agreement to pay the debt by a legacy can afford no consideration for any other promise by the wife, if one were made ; and it results that the claimed contract wholly fails.
Second, as to the intent of the testator. The proposition is to establish that intent by oral testimony. Can it be done? The provision in question is : “I direct that my executor collect and realize on all my life insurance policies, which I hold on my life, and distribute the proceeds in accordance with the terms of my will and codicil,” etc. The subject-matter is Ms policies — my policies, is the phrase. The words following, “ which I hold ” would, in common parlance, signify manual possession, but the expression is subordinate to that which precedes, and, taken in connection with it, implies possession of that which was *578 his. Nor is the result different if a technical legal meaning be given the word “hold. ” In deeds it signifies tenure. But tenure cannot exist in favor of one respecting that in which he has no property interest. If the question were as to a devise of land in this form : “all my land of which I have possession,” would any intelligent mind assume that the will evinced a purpose to convey land of another which might at the time happen to be in the possession of the testator ? Surely not. The canons of construction will not permit a provision clearly disposing only of property in the possession of the testator of which he is the owner to be held to include property in his possession which belongs to another. It follows that clause three of the codicil means that what insurance policies were his the testator disposed of. Those which were not his he did not dispose of, nor attempt to. By the undisputed facts it is established that the certificates in question were issued to the wife and so remained. Under the law, her interest in them, while not a vested one during the husband’s life, was such as he could not change by testamentary disposition. When the by-laws provide, as those of these two orders do, a method by which the beneficiary may be changed that method must be pursued, and, where-no change is thus made, the company’s promise to pay runs only to the person named in the certificate. This point is ruled for us by Arthur v. Odd Fellows' Association, 29 Ohio St., 557. See also, as bearing upon the subject: Weisert v. Muehl, 81 Ky., 336; Block v. Association, 52 Ark., 201; De Silva v. Supreme Council, 109 Cal., 373; Bacon on Beneficial Societies, section 307; Holland v. Taylor, 111 Ind., 121; Martin v. Stubbings, *579 126 Ill., 387; Association v. Bunch, 109 Mo., 560; Masonic Association v. Jones, 154 Penna. State, 107. Nor is the fact that the insured paid the dues or assessments sufficient to overcome the legal effect of the terms of the contract. Weber v. Paxton, 48 Ohio St., 266. The by-laws of the orders forbid any other conclusion so long as the certificates remain in force, and this doubtless was known to the testator since he had been for years an officer in one of the orders, and presumably familiar with the rules of both. It follows that, giving effect to the terms of the codicil, the certificates of Mrs. Charch were not disposed of.
But, under favor of the rule that the true intent of the testator is to be the guiding star in the interpretation of a will, it is proposed to extend the meaning of the words used in clause three so as to make them embrace insurance policies not his, and this by oral testimony. It cannot be done unless it be first shown thatthereis a false description, that is, that there are no policies or certificates on which the provision can operate. The rule is so well established that parol evidence cannot be permitted, either to contradict, add to or explain the contents of a written will, that authorities are hardly needed in its support. We content ourselves with citing’ 1 Jarman on Wills, 6th Ed., p. 412; Painter v. Painter, 18 Ohio Rep., 247; Collins v. Hope, 20 Ohio Rep., 493, and Wigram on Wills, section 159, from which latter authority we quote : “If the words of the will are applicable to any subject, the court is inflexible in applying them accordingly.” It therefore devolved upon those attacking Mrs. Charch’s right to the certificate to show that, unless these should be included there would be nothing for the provision, as here *580 inbefore construed, to operate upon. There is no attempt affirmatively to show this, and the presumption from the whole record is to the contrary.
Our conclusion upon the whole case is that the widow was not required to elect between the provisions of the will and codicil and the benefit secured by these certificates. As held in Huston v. Cone, 24 Ohio St., 11, “where a will assumes to give to one of its beneficiaries property belonging to another person for whom provision is likewise made in the will, the latter is bound to elect whether he will claim the property so disposed of, or take the provision-made for him in the will. ” But it is also well settled that the language of the will expressive of the intent to give another’s property must be unequivocal. If the provision in question, taken in connection with the whole will, will reasonably admit a construction not involving a disposition of such property, that construction must prevail. In order to create the necessity for an election, there must appear upon the face of the will itself a clear, unmistakable intention on the part of the testator to dispose of property which is in fact not his own. The language must be so clear as to leave no doubt as to the testator’s design; the necessity for an election cannot arise from an uncertain or dubious interpretation of the will. We are not, however, required to look farther than the third clause of the codicil, for no other portion helps to explain that. Pomeroy’s Equity, sections 472-3; 1 Jarman on Wills, 6th Ed., 460; 2 Story’s Eq. Jur., section 1086. The case at bar is dissimiliar from Hibbs v. Ins. Co., 40 Ohio St., 543, relied upon in argument, in this important particular. There the description of the property of the wife was clearly defined, and *581 it was clearly included in the devise; here it is not only not clearly included, but is, as we think, clearly excluded by the terms of the codicil.
It results that the controlling considerations in the case were the legal effect of the insurance certificates standing in the name of Mrs. Charch, and clause three of the codicil, as properly construed. The material facts being conceded it remained only to apply the correct rule of law. And the law being how held in her favor, Mrs. Charch is, under the ruling in Minnear v. Holloway, 56 Ohio St., 148, entitled to judgment. The circuit court, therefore, did not err in rendering final judgment, but as we think and hold, did err in giving- judgment for the wrong party. The judgment of the circuit court will be reversed and that of the common pleas affirmed.
Reversed.